*If this opinion indicates that it is "FOR PUBLICATION," it is subject to revision until final publication in the Michigan Appeals Reports.*

# STATE OF MICHIGAN

# COURT OF APPEALS

WILLIAM AHEE,

      Plaintiff-Appellee,

v

CITY OF NOVI, NOVI SENIOR
TRANSPORTATION, and TERRY EASTIN,

      Defendants,

and

AUTO-OWNERS INSURANCE COMPANY,

      Defendant/Cross-Plaintiff-Appellee,

and

US SPECIALTY INSURANCE COMPANY,

      Defendant/Cross-Defendant-
      Appellant.

UNPUBLISHED
March 19, 2019

No. 341072
Oakland Circuit Court
LC No. 2016-152483-NI

Before: GLEICHER, P.J., and K. F. KELLY and LETICA, JJ.

GLEICHER J. (*concurring*).

I concur with the result reached by the majority, but write separately to suggest an alternate analysis. Guided by the primary purpose/incidental benefit test described in *Farmers Ins Exch v AAA of Mich*, 256 Mich App 691; 671 NW2d 89 (2003), the majority holds that William Ahee's insurer is first in priority for payment of Ahee's personal protection insurance (PIP) benefits. The test was developed because the statutory test is not a model of clarity. Despite the statute's lexical challenges, the test is unnecessary. A contextual reading leads to the same conclusion.

I

This insurance priority dispute pits the insurer for the injured party, William Ahee (Auto-Owners) against the insurer for the city of Novi (US Specialty). Ahee was injured while a passenger in a van operated by the city's Older Adult Services Transportation Program (OASTP). Under the no-fault act, MCL 500.3101 *et seq*., an injured person usually looks first to his own insurer for coverage, and Ahee did so. Auto-Owners resisted coverage, asserting that MCL 500.3114(2) compelled the city's insurer to cover Ahee's claim. This subsection establishes an exception to the general rule that a claimant's own insurer stands first in line for payment of PIP benefits. When an injury occurs to an operator or passenger "of a motor vehicle operated in the business of transporting passengers," priority for payment shifts to the insurer of *that* vehicle. Section 3114(2) reflects a legislative policy choice that entities "in the businesses of transporting passengers" should bear the primary responsibility for providing no-fault benefits to passengers under their control.

The city countered Auto Owners' "business transportation" argument with yet another statutory exception. Six subsections of MCL 500.3114(2) boomerang priority for payment back to the claimant's insurer by relieving certain entities "in the business of transporting passengers" from first-order priority. Claimants injured in vehicles designated for this special treatment must look first to their *own* insurer for coverage, despite that the vehicle in which the injury occurred was "in the business of transporting passengers." Pertinent here, the insurer of "[a] bus operating under a government sponsored transportation program" is second in priority to a claimant's own coverage. MCL 500.3114(2)(c). The statute and its subsections provide as follows:

(2) A person suffering accidental bodily injury while an operator or a passenger of a motor vehicle operated in the business of transporting passengers shall receive the [PIP] benefits to which the person is entitled from the insurer of the motor vehicle. This subsection does not apply to a passenger in any of the following, unless the passenger is not entitled to [PIP] benefits under any other policy:

(a) A school bus, as defined by the department of education, providing transportation not prohibited by law.

(b) A bus operated by a common carrier of passengers certified by the department of transportation.

(c) A bus operating under a government sponsored transportation program.

(d) A bus operated by or providing service to a nonprofit organization.

(e) A taxicab insured as prescribed in [MCL 500.3101 or MCL 500.3102.]

(f) A bus operated by a canoe or other watercraft, bicycle, or horse livery used only to transport passengers to or from a destination point.

(g) A transportation network company vehicle. [MCL 500.3114.]

My approach to this statute is grounded in its object, which is to establish priority rules that generally place insurers for motor vehicles "in the business of transporting passengers" in the first tier, while recognizing that exceptions should exist for motor vehicles that may be said to be in the transportation "business," but merit relief from top-priority status.

II

Because the city of Novi was not "in the business of transporting passengers," the majority holds, MCL 500.3114(2) does not shift priority to the city; it remains with the injured party's insurer. The majority reaches this conclusion by applying a two-factor, judge-made test. The factors go well beyond the statute's text, posing two questions that, if answered affirmatively, mean that a motor vehicle was "in the business of transporting passengers:" (1) whether the transportation of passengers is the primary purpose for which the vehicle is used, and (2) whether the transportation of passengers is a primary rather than an incidental component of the overall business or activity of the operator.

Although MCL 500.3114(2) is not elegantly drafted, the statute's structure, language, and purpose, taken together, clarify the manner in which the Legislature intended it to operate, making the test superfluous. In my estimation, the city is "in the business of transporting passengers," but nevertheless second in priority due to the exceptions shifting priority back to a claimant's own insurer.

III

This Court adopted the "primary purpose/incidental benefit" test because it found that the phrase "in the business of transporting passengers" lacked a "clear and unambiguous meaning." *Farmers Ins Exch*, 256 Mich App at 697. Older case law posited that the phrase related only to "commercial" situations. *Id*. at 698. But this Court had also observed that the "commercial" rubric did not adequately account for some common situations, such as the one considered in *Thomas v Tomczyk*, 142 Mich App 237; 369 NW2d 219 (1985). There, college students paid a friend for transportation to and from school. *Id*. at 239. Although in a sense a "commercial" arrangement, making money on transportation was not the "primary function" of the car's owner. *Id*. at 240 n 2. Without much analysis, the *Farmers Ins* panel declared that the Legislature could not have intended subsection 3114(2) to include the college students' deal. *Farmers Ins Exch*, 256 Mich App at 701. In *Farmers Ins*, the Court confronted facts also not suggestive of an archetypal commercial transport relationship: children who were injured while riding in a car driven by their daycare provider. *Id*. at 693. In that case, the Court explained, the driving was undertaken only "incidentally to the vehicle's primary use as a personal vehicle." *Id*. at 701. And so, the "primary purpose/incidental benefit" test was born.

I suggest that the Legislature understood that the phrase "in the business of transporting passengers" was susceptible to two common interpretations. The first is the obvious one: a commercial, for-profit endeavor. But "in the business of" has a second meaning akin to "a regular occupation," undertaking, or activity. The New Hampshire Supreme Court has recognized this second meaning: "It may mean any regular activity that occupies one's time and attention, with or without direct profit motive, it can mean an activity with a direct profit objective." *American Legion Post No 49 v Jefferson Ins Co of New York*, 125 NH 758, 759; 485

-3-

A2d 293 (1984). See also *Mustard v Owners Ins Co*, 2014 Ohio 865; 6 NE3d 1235, 1241 (Ohio Ct App, 2014) ("Rather, here the obvious purpose of the phrase 'in the business of,' is to describe the nature of the activity engaged in and has nothing to do with the corporate status of the insured."). I believe that because the phrase "in the business of transporting passengers" reasonably could be interpreted to apply to nonprofit and governmental enterprises offering transportation regularly but not for profit, the Legislature added the exceptions.

At the time of his accident, Ahee was being transported in a van engaged in a regular activity—picking up passengers at various sites in the city, and driving them to certain city-designated locations. The van's operation is sponsored by the city. An exhibit filed in the circuit court includes a link to a flyer distributed by the city, advertising that its OASTP "provides specialized transportation for the residents of Novi age 55+ or those under 55 with a limiting disability." This service was approved by the Novi City Council and is funded by public and nonprofit sources. When the phrase "in the business of" is interpreted as a systematic action, regularly undertaken, it would follow that in offering this service to residents, the city engages "in the business of transporting passengers."

The majority dodges this conclusion by focusing on the fact that the OASTP, a division of the city's Parks, Recreation and Cultural Services Department, actually operates the van. Therefore, the majority reasons, the *city* is not "in the business of transporting passengers." This strikes me as a distinction without a difference, as the OASTP is a city-funded, city-controlled entity. The city owns the van, promotes the transportation service, operates the van through its parks and recreation department, and provides most of the money used to run it. Part of the city's business, it appears, includes delivering this important transportation service to needy residents.

My respectful disagreement with the majority regarding the interpretation of "in the business of transporting passengers" underscores why tests requiring the application of factors created by judges can be perilous. The majority concedes that had it focused on the city rather than the OASTP when applying the test, it may have reached a different result. In other words, the test is not really objective and does not yield predictable results. Here, it seems obvious that the city is "in the business of transporting passengers" through the OASTP, and unless this activity is bumped from first-priority status, the city should be responsible for payment of Ahee's no-fault benefits.

IV

One interpretive obstacle remains: does the city fall within any of the exceptions that direct coverage back to the injured party's own insurer? I would hold that it does. My analysis hinges on my conclusion that the term "bus" as it is used in the statute is ambiguous.

Subsections (2)(b), (c), and (d) place the insurers of certain "bus[es]" second in priority rather than first. These legislatively favored insurers underwrite buses operated by "common carrier[s] . . . certified by the department of transportation," buses "operated under a government sponsored transportation program," and buses "operated by or providing services to a nonprofit organization." Auto-Owners insists that the van in which Ahee was injured is not a "bus," and that the priority-shifting exceptions do not apply.

The word "bus" is not defined in the no-fault act. "Bus" has a variety of meanings, depending on which dictionary (and which specific definition) is selected for guidance. Dictionaries aside, the word can be reasonably understood to refer to a range of different vehicles. Some buses are small ("minibuses"), some are extremely large (articulated buses that "fold" around corners); some travel a certain route every day, others are chartered, and still others make stops at a passenger's request. A statutory provision is ambiguous if "it is equally susceptible to more than a single meaning." *Mayor of Lansing v Public Serv Comm*, 470 Mich 154, 166; 680 NW2d 840 (2004). I believe that as used in the statute, the word "bus" is ambiguous. The most natural meaning of the term, particularly in 1976 when the "bus" exceptions were added to the statute, is "a large vehicle that carries people around." Reasonably interpreted, "a bus operating under a government sponsored transportation program," encompasses the OASTP vehicle for the purpose of the statute.

When originally enacted in 1972, MCL 500.3114(2) did not include any exceptions. It stated only:

> A person suffering accidental bodily injury while an operator or a passenger of a motor vehicle operated in the business of transporting passengers shall receive the [PIP] benefits to which he is entitled from the insurer of the motor vehicle.

In 1976, the Legislature qualified this language with five exceptions, subsections (a) through (e), which are maintained in the current version of the statute.[1] In *USAA Ins Co v Houston Gen Ins Co*, 220 Mich App 386, 391-392; 559 NW2d 98 (1996), this Court explained that the exceptions were intended to "eas[e] the financial burden on the operators of vehicles used in government-sponsored transportation programs or providing service to nonprofit organizations." The *Houston* majority supported this inference by quoting a legislative analysis reciting that public and government-sponsored bus companies " 'are all under a severe financial strain' " due to the high cost of insurance, and that " '[n]on-profit organizations of all kinds are traditionally short of funds and would benefit greatly from being relieved of the cost of large insurance premiums.' " *Id*. at 392, quoting House Legislative Analysis, HB 6448, September 27, 1976.

I acknowledge that our Supreme Court frowns on the use of legislative history as an interpretive tool. Legislative history aside, the exceptions engrafted on MCL 500.3114(2) obviously reflect the Legislature's desire to decrease insurance costs for certain selected transportation "businesses." The Legislature accomplished this goal by shifting the priority for payment back to the injured person's own insurer, despite that the entities selected for special treatment were "in the business of transporting passengers."

---

[1] Recently the Legislature added MCL 500.3114(2)(g), excepting "[a] transportation network company vehicle," which the Legislature defined as "a personal vehicle while the driver is logged on to the transportation network company digital network or while the driver is engaged in a prearranged ride." MCL 500.3114(7)(b).

Against that backdrop, what did the Legislature mean when it used the term "bus"? A different panel of this Court has already considered the same question, and I draw on that panel's research into the dictionary definition of the term:

> The dictionary defines "bus" as "a large motor vehicle designed to carry passengers, usu[ally] along a fixed route according to a schedule," *Merriam-Webster's Collegiate Dictionary* (11th ed), or more simply as a "long motor vehicle for carrying passengers," *Webster's New College Dictionary* (3d ed). [*MIC Gen Ins Corp v Mich Muni Risk Mgt Auth*, unpublished per curiam opinion of the Court of Appeals, issued October 18, 2018 (Docket No. 341766), unpub op at 7, lv pending.]

The van involved here certainly qualifies as "a large motor vehicle designed to carry passengers." Although the first dictionary definition cited adds that a bus "usually" carries passengers along a fixed route, the panel in *MIC Gen Ins Corp* observed that the word "usually" renders the balance of the definition "inessential." *Id*. at 8. The panel added:

> Moreover, to interpret the term as encompassing only those vehicles that operate according to a fixed route or schedule would exclude vehicles that are undisputedly buses but operate on a charter basis. Accordingly, the plain and ordinary sense of the term "bus" does not necessarily require operation on a fixed route or schedule. [*Id*. at 10.]

So far, so good; it appears that the van involved in Ahee's accident also falls within the definition of a "bus." But the panel in *MIC Gen Ins Corp* resisted this conclusion, holding instead that the similar van involved in that case was a "van," not a "bus." *Id*. That panel also noted the existence of other definitions of "bus" in Michigan law. For example, the Michigan Vehicle Code, MCL 257.1 *et seq.*, defines a bus as "a motor vehicle designed for carrying 16 or more passengers, including the driver," excepting a school bus. MCL 257.4b. Under that definition, the vehicle in which Ahee was injured is too small to qualify as a bus. The Motor Bus Transportation Act, MCL 474.101 *et seq.*, defines a bus as: "a motor vehicle with a seating capacity of 9 or more passengers, including the driver, that is used in the transportation of passengers and their baggage for hire upon any public highway of this state." MCL 474.103(e). The van transporting Ahee was configured for up to six passengers.[2]

---

[2] Federal law regarding the definition of "bus" presents similar challenges. See *Alex's Transp, Inc v Colorado Pub Utilities Comm*, 88 F Supp 2d 1147, 1149 n 3 (D Colo, 2000) ("[T]he term bus is defined in contradictory manners throughout the federal code and regulations. See i.e., 49 USC 14301 (applying only to a motor bus with a seating capacity of at least 10 individuals); 49 USC 30127 (defining bus as a motor vehicle designed to carry more than 10 people); and 49 CFR 390.5 ("Bus means any motor vehicle designed, constructed, and/or used for the transportation of passengers, including taxicabs").).

Absent a definition of the word "bus" in the no-fault act, judges are left to guess at what the Legislature had in mind. What if a passenger in a government-sponsored transportation program is injured in a 12-passenger, "large motor vehicle designed to carry passengers"? Is that a bus? Given that there is no definition of the term available to us, why should it matter that a vehicle used for precisely the same purpose (perhaps by a small city) seats six instead of 12? It seems obvious that a vehicle designated as a "van" by its manufacturer can look and act exactly like a "bus."

The meaning of "bus" as the word is used in MCL 500.3114(2)(b), (c), (d) and (f) is simply not susceptible to a single meaning. Therefore, we must examine the context in which the Legislature used it. "Where the language of a statute is of doubtful meaning, a court must look to the object of the statute in light of the harm it is designed to remedy, and strive to apply a reasonable construction that will best accomplish the Legislature's purpose." *Marquis v Hartford Accident & Indemnity*, 444 Mich 638, 644, 513 NW2d 799 (1994). "[W]hen necessary to interpret an ambiguous statute, the appellate courts must determine the reasonable construction that best effects the Legislature's intent." *Mich Basic Prop Ins Ass'n v Office of Fin & Ins Regulation*, 288 Mich App 552, 560; 808 NW2d 456 (2010). This is particularly true in the no-fault insurance context. Terms contained in the no-fault act are read "in the light of its legislative history and in the context of the no-fault act as a whole." *Gobler v Auto-Owners Ins Co*, 428 Mich 51, 61; 404 NW2d 199 (1987).

A rational appraisal of the statute taken as a whole supplies an interpretation of the term "bus" vindicating the Legislature's intent. MCL 500.3114(2) is a priority-shifting provision positioning transportation businesses first in line for payment of PIP benefits. Foremost among the exceptions to the "businesses first" rule are "buses" that may be in "the business" of transportation, but should not be primarily responsible for coverage due to the public interests they serve. School buses, buses operated by government-certified common carriers, buses operating under a government-sponsored transportation program, and buses operated by or providing services to a nonprofit organization represent most of the legislative exceptions. Interpreting the vehicle in which Ahee was transported as a "bus" harmonizes with the statute's purpose, which is to reduce insurance costs for public-interest carriers.

In enacting the exceptions, the Legislature judged that certain activities merit special protection when it comes to the availability and cost of insurance. Construing conveyances owned and operated by cities on behalf of needy citizens fulfils that judgment. On that basis, I concur with the majority and would reverse the circuit court.


/s/ Elizabeth L. Gleicher